FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
JUL 2 4 2002
Robert M. March
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ROLAND SCACCI,

    Plaintiff,

vs.     Civ. No. 01-1091 BB/RLP

JO ANNE BARNHART,
Commissioner of Social Security,

    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

### I. Procedural Background

1.     Plaintiff, Ronald Scacci, ("Plaintiff" herein), filed an application for Disability Income benefits under Titles II and XVI of the Social Security Act on April 10, 1998, alleging disability as of that date due to the inability to pass the active duty physical necessary for continued membership in the Army National Guard.[2] (Tr. 50-52, 77). Plaintiff further alleged that he suffered symptoms related to Post Traumatic Stress Disorder ("PTSD," herein). (Tr. 83). His application was denied at the first level of administrative review. (Tr. 24, 25, 100). No further review related to this application was sought.

2.     Plaintiff filed a subsequent application for benefits under Title II on September 14, 1999[3],

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] Plaintiff was found medically unfit for retention in military service due to anxiety disorders and personality behavior. (Tr. 121, 251-254).

[3] The ALJ misstated or misconstrued the date of the relevant application for benefits. He acknowledged that a prior application for benefits had been denied at the administrative level with no appeal taken, but then referred to that application in evaluating Plaintiff's claims, rather than to the relevant application filed September 14, 1999. (Tr. 13).



alleging disability as of May 20, 1999, stating that he was unable to adjust to civilian jobs, and got "real anger (sic) all the time." (Tr. 53, 91). He also alleged PTSD, depression, anxiety and mood changes. (Tr. 103). This claim was denied at the first and second levels of administrative review, and by an Administrative Law Judge ("ALJ," herein). (Tr. 26, 36, 27, 40, 13-18). The Appeals Council declined to review the ALJ's decision. (Tr. 6-7).

3. Plaintiff seeks reversal for an award of benefits, or alternatively, remand of this action for further proceedings. He contends that he meets the severity or "B" criteria under Listing §12.04 (affective disorders) and/or §12.08 (personality disorders).

## II. Standard of Review

4. This Court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied.[4] Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[5] In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole.[6]

5. Plaintiff was born on January 23, 1948. (Tr. 50). He is a high school graduate. (Tr. 81). He served in various branches of the military service. (Tr. 266). From January 1984 to April 1998 was employed as a personnel sergeant in the Army National Guard. (Tr. 92).

---

[4] Castellano v. Secretary of Health & Human Services, 26 F.3d 1027, 1028 (10th Cir.1994).

[5] Soliz v. Chater, 82 F.3d 373, 375 (10th Cir.1996) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

[6] Dollar v. Bowen, 821 F.2d 530, 532 (10th Cir.1987).

### III. Factual Background

6.  In 1996 Plaintiff was evaluated and treated for PTSD (mild), and Major Depression-recurrent (moderate) at the Veterans Administration Hospital-Dallas ("VA-Dallas" herein). (Tr. 170,179-181). Commencing in October 1996 (Tr. 168) he was seen for weekly in counseling (Tr. 153-183), and received psychotropic medication[7], with some improvement in mood. (Tr.169). Counseling sessions were reduced to twice a month as of March 4, 1997. (Tr. 168). Plaintiff was able to continue working during this time. (See, e.g., 132-133, 166-167, 169, 176, 180). A variety of stressors affected Plaintiff in 1997, including marital discord (see, e.g., 127, 130, 132-133, 161, 164-166, 170-174, 176-177), difficulties getting along with others at work (see, e.g., 127, 161, 170 ), and his classification as medically unfit leading to involuntary discharge from military service. (Tr. 121, 126, 128, 161, 254).

7.  In August 1997, the service-related nature of Plaintiff's diagnosis of PTSD was called into question given discrepancies between Plaintiff's statements regarding his combat experience and what his military record documented. (Tr. 128-129, 162-163).

8.  Plaintiff elected to take medical disability retirement from the Army National Guard after receiving written notice of the decision to separate him from Guard membership for medical reasons. (Tr. 56) Although the records indicate different dates for his service discharge (Tr. 123, 255), Plaintiff has identified April 10, 1998, as the effective date. (Tr. 81, 91). Plaintiff collected

---

[7]Treatment notes of February 21, 1997, and November 21, 1997, state that Plaintiff was prescribed *Divalproex*, and *Hydroxyzine*. (Tr. 169). *Divalproez,* also known as *Depakote*, is indicated in the treatment of manic episodes associated with bi-polar disorder. http:www.rxlist.com/cgi/generic/diva_ids.htm. See Tr. 132, 166, and 124 for references to bi-polar symptoms or bi-polar disorder by Plaintiff's treating doctors. *Hydrozyzine* is used for symptomatic relief of anxiety and tension with psychoneurosis. http:www.rxlist.com.cgi.generic/hydrox_ids.htm. He discontinued use of *Hydroxyzine* some time prior to May 18, 1998. (Tr. 83).

unemployment insurance prior to being hired as a Corrections Officer II by the Texas Department of Criminal Justice in September 1998. (Tr. 156, 120). He testified that he attended training for this position, graduating thirtieth out of 247 candidates. (Tr. 262). He further testified that he was placed in a maximum security facility in November 1998, and worked at that facility until May 1999 when he was told to resign or be fired. (Tr. 262). This resignation/firing was prompted by Plaintiff's use of snuff while on duty. (Tr. 185, 269-270).

9. There is no evidence that Plaintiff sought or received psychiatric or psychological treatment from June 1998 to April 1999. He returned to the VA-Dallas on April 26, 1999, stating that he had been off medication for several months. His wife indicated that he had not taken medication for a year. (Tr. 154-155). *Depakote* was re-prescribed and he was scheduled for monthly counseling. Id. He did not return for counseling.[8] Id. At some point thereafter Plaintiff began receiving additional psychotropic medications from the VA-Dallas. He continued to take *Depakote*, and was also prescribed *Zoloft, Diazepam, Sertraline* and T*razodone*.[9] (Tr. 186, 220, 208, 215).

10. Plaintiff moved to Roswell, New Mexico, in August 1999. (Tr. 262). He was seen at the Veterans Administration Clinic- Artesia ("VA-Artesia" herein) on October 20, 1999, complaining of various physical problems and depression. (Tr. 221, 227).

11. On December 3, 1999, Plaintiff was evaluated by Robert Karp, M.D., at the request of the Disability Determination Unit. (Tr. 187-189). Dr. Karp's evaluation is notable for repeated references to Plaintiff's angry, aggressive and threatening demeanor. In terms of mental status

---

[8] Subsequent medical records indicate that Plaintiff was seen in "treatment group in El Paso." (Tr. 222). No records documenting this treatment are contained in the administrative record.

[9] VA records indicate that *Divalproex* (*Depakote*) was prescribed for anger, *Trazodone* for depression, *Diazepam* and anxiety and insomnia, and *Sertraline* for depression. (Tr. 220).

4

examination, Dr. Karp noted:

> He was in good contact with the interviewer, and the environment. He wasn't very friendly, and wasn't that cooperative. . . His speech sounds like he has a mouthful of something, which he actually does. He has a lot of snuff in his mouth, but I don't think that's responsible for this speech impediment. It doesn't sound like he is intoxicated or slurred in that fashion. There is no other abnormality of speech or of psychomotor activity. His associations are intact. There is no evidence of hallucinations or of delusions. He denies perceptual distortions. He says he feels "angry." He acts very angry, extremely rude, and is truly threatening. He seemed to be very serious about what he was saying and I would not be surprised if he would became (sic) assaultive in an instant. He was aware of the date. Could recall three of three objects immediately . . . He could only remember two of the three words after five minutes. He was able to remember seven digits forwards, but when asked to recite digits backwards, did them forwards, until reminded, and then was able to recite four digits backwards properly. He could perform simple commands, could subtract seven from a hundred properly and fairly quickly, but was not able to give abstract interpretations to simple proverbs. In fact, he gave bizarre interpretations to proverbs which were incorrect, although they were abstract. . . There is no evidence of any significant impairment in past memory. He denies any suicidal or homicidal ideas now. His affect demonstrates no lability, no flatness, and is appropriate to content. . .

Tr. 187-188.

Based on his interview and the mental status examination, Dr. Karp concluded that Plaintiff was a sociopath, whose primary problem was with judgment, and whose secondary problem was with anger. He described Plaintiff as "somewhat depressed," and assigned an Axis I diagnosis of dysthymia and substance dependence (not current), an Axis II diagnosis of personality disorder, antisocial traits severe, with low intellectual capacity and a Global Assessment of Functioning ("GAF"herein) of 60.[10] (Tr. 188-189). He further stated:

---

[10]The GAF score represents Axis V of the Muliaxial Assessment system. See American Psychiatric Asso., Diagnostic and Statistical Manual of Mental Disorders pp. 25-30 (4th Ed. 1994) ("DSM-IV"). The axial system of evaluation enabled the clinician to comprehensively and systematically evaluate a client. Id. at 25. The GAF rates the client's "psychological, social and occupational functioning. Id. at 30. A GAF of 60 is indicative of "Moderate symptoms . . . or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with co-workers." Id. at 32.

5

> *In relation to his Axis I diagnosis only*, I believe that he has very little impaired ability to understand and remember basic instructions, or to concentrate and persist at tasks of basic work and little impairment to interact with the general public and or coworkers and adapt to changes in the work place. (Emphasis added).

(Tr. 189).

12. In November 1999 Plaintiff went to work for the Job Corp in Roswell, New Mexico. He testified that although he was he was hired as a substitute residential advisor, he actually did janitorial work. He remained at this job for six weeks. (Tr. 267).

13. On January 8, 2000, Plaintiff sought individual therapy and psychiatric services at Counseling Associates, Inc., in Roswell, New Mexico. (Tr. 207-217). Based on Plaintiff's history, including his military service, past mental health treatment, recent illegal drug use, demeanor and mental status, he was given an Axis I diagnosis of PTSD chronic, delayed onset, Major depressive disorder, recurrent, moderate, R/O Attention-deficit hyperactivity disorder, Amphetamine and cocaine abuse, and assigned a GAF of 42.[11]  Due to Plaintiff's abusive telephone calls, Counseling Associates refused to initiate treatment, and referred him to the VA-Artesia for care. (Tr. 205-206, 221).

14. Plaintiff was evaluated at the VA-Artesia on January 20, 2000, and asked to return for a mental health assessment in order to rule out PTSD versus Major Depressive Disorder. (Tr. 220-221). No further medical records are contained in the administrative record. Plaintiff made inconsistent statements regarding subsequent mental health care. In written materials he initially stated that he saw Dr. Farmer at the Veterans Administration Clinic once every four months to renew his medications. On the following page he stated that he saw Dr. Farmer three times a month to

---

[11] A GAF of 42 is indicative of "Serious symptoms. . . or any serious impairment of social, occupational or school functioning (e.g., no friends, unable to keep a job.)" **DSM-IV** at 32.

receive benefits for PTSD and to renew his medications.[12] He testified that he obtains medication but no therapy from Dr. Farmer. (Tr. 290).

## IV. Analysis

15. The Commissioner uses a five-step process to determine the existence of a disability.[13] At the first step, the ALJ evaluates whether the claimant is currently engaged in substantial gainful activity.[14] Despite uncontroverted evidence to the contrary, the ALJ found that Plaintiff had not been engaged in substantial gainful activity since April 10, 1998.[15] (Tr. 14). At the second step, the ALJ determines whether the claimant has a severe impairment or combination of impairments.[16] The ALJ found Plaintiff's mental impairments of depression and personality disorder with anti-social traits were severe. (Tr. 15). At step three, the Commissioner determines whether the impairment meets or equals a listed impairment.[17] In doing so, the Commissioner is required to follow a specified procedure in determining the presence or absence of specified medical findings, the "Part A criteria," and to rate the severity of those findings, the "Part "B" criteria. When there is evidence of a mental impairment, the ALJ also must prepare and attach to his decision a Psychiatric Review Technique Form (PRT form) that tracks the listing requirements and evaluates the claimant under

---

[12]Compare Tr. 116 with Tr. 117.

[13]20 C.F.R. §404.1520; Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir.1988)(discussing five steps in detail).

[14]20 C.F.R. §404.1520(b).

[15]Plaintiff worked from November 1998 to May 1999 as a corrections officer in the Texas Prisons system, earning $11,739 in 1999. (Tr. 262, 120, 66).

[16]20 C.F.R. §404.1520(c).

[17]20 C.F.R. § 404.1520(d)

the Part A and B Criteria.[18]

16. Plaintiff contends that he meets the criteria for two listings, §12.04 - Affective disorders and §12.08 - Personality disorders. For the degree of functional loss to meet the required level of severity under listing §12.04, the claimant's mental impairment must result in at least two of the following, while §12.08 requires three of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04(B), §12.08(B).

17. The ALJ did not complete a PRT and append it to his decision. In his decision, he found that Plaintiff had "marked" limitation in social functioning, but no limitation in activities of daily living, slight impairment in concentration, persistence and pace, and moderate (once or twice) episodes of deterioration in work or work-like settings. (Tr. 15). These findings do not match those of any of the three agency physicians or psychiatrists who evaluated Plaintiff's claim. (See Appendix 1, attached hereto). The evaluation of one agency physician, Dr. Patterson, supports the finding of listing level severity for Listing 12.04. The ALJ did not address Dr. Patterson's findings. The ALJ cited to the evaluation by Dr. Karp in support of his findings for the "B" criteria. Dr. Karp did not prepare a PRT form. He did not address the number of Plaintiff's episodes of decompensation or deterioration. His conclusions in terms of concentration abilities and social functioning were limited

---

[18] Cruse v. U.S. Dep't of Health & Human Services, 49 F.3d 614, 617 (10th Cir. 1995).

to the impact of Plaintiff's Axis I diagnosis of dysthymia, and did not take into consideration the functional impact of Plaintiff's Axis II diagnosis of Personality Disorder, anti-social, severe. (Tr. 15, referring to Tr. 185-189).

18. Accordingly, I find that the ALJ failed to apply correct legal principles in evaluating Plaintiff's claim at step three, and that his decision is not supported by substantial evidence.

## V. Recommended Disposition

19. I recommend that Plaintiff's Motion to Reverse and Remand be granted in part, and that this cause be remanded to the Commissioner for the following:

   A. Reconsideration of the date of onset of Plaintiff's disability, if any. The Commissioner is to specifically consider Plaintiff's work activities as evidenced in the record and set forth in ¶ 8, above.

   B. Reconsideration of and proper documentation of Plaintiff's claim at step three of the sequential evaluation process, consistent with the requirements of <u>Cruse v. U.S. Dep't of Health & Human Services</u>, <u>supra</u>.

_____
Richard L. Puglisi
United States Magistrate Judge

Appendix 1
Psychiatric Review Technique Form Ratings of Severity or "B" criteria
by Agency Physicians or Psychologists

| | Restriction in Activities of Daily Living | Difficulties Maintaining Social Functioning | Deficiencies of Concentration, Persistence & Pace | Episodes of Deterioration or Decompensation in Work/Work-like Settings |
|---|---|---|---|---|
| Robert M. Gilliland, M.D.<br>7/14/98    Tr. 151 | Slight | Moderate | Never | Never |
| LeRoy Gabaldon, PhD<br>12/15/99    Tr. 198 | Slight | Moderate | Seldom | Insufficient Evidence |
| Helen Patterson, PhD<br>3/2/00    Tr. 236 | None | Marked* | Seldom | Repeated* |

ALJ's Rating of Severity or "B" Criteria

| | | | | |
|---|---|---|---|---|
| ALJ<br>3/29/01    Tr. 15 | Can perform all independently & appropriately. | Marked* | Slight, per evaluation of consulting psychiatrist | Once or twice, citing to 1995 hospitalization. |

Consulting Psychiatrist's Comments, as They Relate to Areas of Functioning

| | | | | |
|---|---|---|---|---|
| Robert L. Karp, M.D.<br>12/3/99    Tr. 188-189 | | Axis II diagnosis: Personality Disorder, antisocial traits, severe. Demeanor is angry and threatening. In relation to Axis I diagnosis only (Dysthymia & substance abuse), little impairment to interact with the general public and/or coworkers and adapt to changes in the workplace | Some lifelong concentration problems. In relation to Axis I diagnosis only, very little impaired ability to understand and remember basic work instructions or to concentrate and persist at tasks of basic work. | |

10